## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| **STEPHANIE L. FINNEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:12CV00065 LMB** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Stephanie L. Finney for Disability Insurance Benefits under Title II of

the Social Security Act.  This case has been assigned to the undersigned United States Magistrate

Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See

28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 14).  Defendant

filed a Brief in Support of the Answer.  (Doc. No. 21).  Plaintiff filed Reply.  (Doc. No. 24).

### Procedural History

On April 28, 2011, plaintiff filed an application for Disability Insurance Benefits, claiming

that she became unable to work due to her disabling condition on January 1, 2011.  (Tr. 11, 156).

This claim was denied initially and, following an administrative hearing, plaintiff's claim was

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

denied in a written opinion by an Administrative Law Judge (ALJ), dated April 5, 2012.  (Tr. 80-84, 8-20).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on July 6, 2012.  (Tr. 7, 1-5).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

### Evidence Before the ALJ

**A.**   **ALJ Hearing**

Plaintiff's administrative hearing was held on April 2, 2012.  (Tr. 28).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Maryann Lumpey.  (Id.).

The ALJ examined plaintiff, who testified that she was forty-eight years of age.  (Tr. 30).  Plaintiff stated that she lives in a mobile home in Purdin, Missouri, with her husband.  (Id.).  Plaintiff testified that her husband works full-time during the day.  (Id.).  Plaintiff stated that she has three adult children, who she sees every couple of weeks.  (Tr. 31).

Plaintiff testified that she was five-feet, one-inch tall, and weighs 120 pounds.  (Id.).

Plaintiff stated that she has a driver's license, and that she drives one to two times in a two-week period.  (Tr. 32).  Plaintiff testified that she typically drives to the grocery store.  (Id.).  Plaintiff stated that she is able to make change when she shops.  (Id.).

Plaintiff testified that she has no source of income.  (Tr. 33).   Plaintiff stated that she last worked in December of 2010 or January of 2011.  (Id.).  Plaintiff testified that she alleged an onset of disability date of January 1, 2011 because she was released from a psychiatric hospital at that time.  (Id.).

Plaintiff stated that she has been diagnosed with COPD,[2] and that she last saw her pulmonologist in the summer of 2011.  (Tr. 34).  Plaintiff testified that she takes medication for COPD and asthma.  (Tr. 35).  Plaintiff stated that she smokes two packages of cigarettes in a one-week period.  (Id.).  Plaintiff testified that her doctors have advised her to quit smoking.  (Id.).

Plaintiff testified that she has been diagnosed with steroids-induced diabetes.  (Id.).  Plaintiff stated that she was more recently diagnosed with Addison's disease[3] due to her steroid use.  (Id.).

Plaintiff testified that she takes thyroid medication.  (Tr. 36).  Plaintiff stated that she has had diverticulitis[4] in the past, and that her doctors recommended a special diet and prescribed a laxative for this condition.  (Tr. 37).  Plaintiff testified that she takes over-the-counter medication for acid reflux.  (Id.).

Plaintiff stated that she has been diagnosed with bipolar disorder.  (Tr. 38).  Plaintiff testified that she has not been seeing a psychiatrist because she is unable to afford treatment.  (Id.).  Plaintiff stated that she saw a psychiatrist, Dr. Jeffrey Harden, one week prior to the hearing, but she had not seen a psychiatrist for six years prior to that visit.  (Tr. 39).  Plaintiff

---

[2]Chronic obstructive pulmonary disease ("COPD") is a general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied.  Stedman's Medical Dictionary, 554 (28th Ed. 2006).

[3]Addison's disease, or chronic adrenocortical insufficiency, is characterized by fatigue, deceased blood pressure, weight loss, and nausea or vomiting.  Stedman's at 983.

[4]Inflammation of a diverticulum, especially of the small pockets in the wall of the colon.  Stedman's at 575.

testified that she saw a counselor during that time.  (Id.).  Plaintiff stated that she takes Prozac[5]

and Seroquel,[6] which are prescribed by her family doctor.  (Tr. 40).

Plaintiff testified that she was hospitalized on January 3, 2011, because she was psychotic.

(Tr. 41).  Plaintiff acknowledged that she was diagnosed with poly-substance abuse, and

prescription drug abuse.  (Id.).  Plaintiff testified that she does not remember the last time she

used methamphetamine or cocaine because she was "out of her mind" at that time.  (Id.).  Plaintiff

stated that she last used alcohol a few days prior to the hearing, at which time she drank one beer.

(Tr. 42).  Plaintiff testified that she occasionally takes too much Ativan[7] when she gets nervous.

(Id.).  Plaintiff stated that she uses marijuana when she does not have Ativan.  (Id.).  Plaintiff

testified that she last used marijuana in either January or April of 2012.  (Id.).  Plaintiff stated that

she also occasionally uses her nebulizer too much because she thinks she is having an asthma

attack when she is really having a panic attack.  (Id.).

Plaintiff testified that she has a history of panic disorder.  (Tr. 43).  Plaintiff stated that she

takes Seroquel and Prozac for this condition.  (Id.).  Plaintiff testified that she last experienced a

panic attack in September of 2010, at which time she had to be taken to the hospital by

ambulance.  (Id.).

---

[5]Prozac is indicated for the treatment of major depressive disorder.  Physician's Desk
Reference (PDR), 1854 (63rd Ed. 2009).

[6]Seroquel is an anti-psychotic drug indicated for the treatment of bipolar disorder and
schizophrenia.  See WebMD, http://www.webmd.com/drugs (last visited August 28, 2013).

[7]Ativan is indicated for the treatment of anxiety.  See WebMD,
http://www.webmd.com/drugs (last visited August 28, 2013).

Plaintiff stated that she has been diagnosed with PTSD[8] due to childhood abuse she suffered.  (Id.).

Plaintiff testified that she used to have high blood pressure, but since she was diagnosed with Addison's, she has had low blood pressure.  (Tr. 44).

Plaintiff stated that the Seroquel has a sedating effect.  (Id.).  Plaintiff testified that she sleeps all the time.  (Id.).  Plaintiff stated that she has been taking Seroquel since her hospitalization at the University of Missouri the previous year.  (Id.).

Plaintiff testified that she was hospitalized after experiencing a breakdown in 2005.  (Id.).

Plaintiff stated that she was fired from her last job for misuse of funds, and that there are criminal charges pending against her as a result.  (Tr. 45).

Plaintiff testified that she takes Ativan on a daily basis for her nerves.  (Id.).  Plaintiff stated that the Ativan was prescribed to her on an as-needed basis.  (Tr. 46).  Plaintiff testified that she had taken Ativan the morning of the hearing.  (Id.).

Plaintiff testified that she does not have any friends.  (Id.).  Plaintiff stated that she does not visit relatives.  (Tr. 47).

Plaintiff testified that she does not do housework, and she rarely cooks meals.  (Id.).  Plaintiff stated that her husband does most of the household chores.  (Id.).  Plaintiff testified that she stays in her bedroom and sleeps all day while her husband is at work.  (Id.).

Plaintiff stated that she is able to lift ten to twenty pounds, bend over, crawl, and climb a

---

[8]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria.  Stedman's at 570.

ladder.  (Tr. 48).  Plaintiff testified that her medications affect her ability to balance.  (Id.).
Plaintiff stated that she is able to reach and grasp small objects.  (Tr. 49).  Plaintiff testified that
she is able to use a computer.  (Id.).  Plaintiff stated that she has difficulties with concentration
and memory.  (Tr. 50).  Plaintiff testified that her family checks on her constantly and does not
allow her to take care of her grandchildren.  (Id.).  Plaintiff stated that she used to enjoy reading
but she is no longer able to finish reading anything because she is easily distracted.  (Id.).  Plaintiff
testified that she is able to follow directions on a good day, but not on a bad day.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that she experiences constant racing
thoughts due to her medication, which prevents her from concentrating long enough to finish a
project.  (Tr. 51).  Plaintiff stated that she is unable to read due to these racing thoughts.  (Id.).

Plaintiff testified that she has gone to the emergency room for asthma and for panic
attacks.  (Tr. 52).  Plaintiff stated that she has difficulty breathing when she is exposed to extreme
heat, dust, and chemical fumes.  (Id.).

Plaintiff testified that she has no memory of her hospitalization at the University of
Missouri Psychiatric Center because she was "out of [her] mind crazy."  (Tr. 53).

Plaintiff stated that she consumes one to two alcoholic drinks a week.  (Id.).  Plaintiff
testified that she drank more in the past.  (Id.).

Plaintiff stated that she smokes marijuana three to four times a year when she is out of
Ativan because it brings her down.  (Tr. 54).

Plaintiff testified that she used cocaine and methamphetamine approximately ten years
prior to the hearing.  (Id.).

Plaintiff stated that she did not participate in group therapy during her psychiatric

hospitalization.  (Tr. 55).  Plaintiff testified that she saw a social worker a few times after her discharge.  (Id.).

Plaintiff stated that she has not seen a psychiatrist or other mental health professional regularly because she cannot afford the co-pays for treatment or medications.  (Tr. 56).  Plaintiff testified that she had to file for bankruptcy and was hospitalized after her last manic episode.  (Id.).  Plaintiff stated that she incurred $42,000.00 in credit card debt on merchandise that she does not need.  (Id.).  Plaintiff testified that her husband goes through the receipts from her debit card purchases and questions her about the purchases.  (Id.).

Plaintiff stated that she goes to Wal-Mart occasionally to grocery shop and that she occasionally does not "do too bad," and follows her list.  (Id.).  Plaintiff testified that on other occasions, she walks in and feels like everyone is staring at her and leaves immediately.  (Tr. 58).

Plaintiff stated that she sleeps most of the day.  (Id.).  Plaintiff testified that she tries to get out of bed and get dressed around 3:00 p.m., before her husband gets home from work.  (Id.).  Plaintiff stated that she stays in bed all day because she does not want to see anyone.  (Id.).

Plaintiff testified that she was sexually abused as a child, and she still experiences flashbacks and disassociation as a result.  (Tr. 59).  Plaintiff stated that she has not seen either of her parents or her brother since 1993.  (Id.).  Plaintiff testified that her past abuse affects her ability to be intimate with her husband, and her ability to watch television programs involving incest or rape.  (Id.).

The ALJ examined vocational expert Maryann Lumpey, who testified that plaintiff's past work is classified as administrator, non-profit organization, and is sedentary and highly skilled.  (Tr. 61).

The ALJ asked Ms. Lumpey to assume a hypothetical claimant with plaintiff's background and the following limitations: lifting and carrying up to twenty pounds occasionally and ten pounds frequently; standing and walking six hours out of eight; sitting six hours out of eight; occasionally balance; and limited to simple unskilled work of SVP 2 or less.  (Tr. 61-62).  Ms. Lumpey testified that the individual would be unable to perform plaintiff's past work, but would be capable of performing other work such as cashier II (950,000 positions nationally, 8,000 in Missouri); mail clerk (150,000 positions nationally, 1,200 in Missouri); and subassembler (18,000 positions nationally, 1,200 in Missouri).  (Tr. 62).

The ALJ next asked Ms. Lumpey to assume the same limitations as the first hypothetical with the following addition: limited contact with the general public.  (Tr. 63).  Ms. Lumpey testified that the mail clerk and subassembler positions would remain.  (Id.).  Ms. Lumpey stated that the individual would also be capable of working as a wire wrapping machine operator (85,000 positions nationally, 1,100 in Missouri).  (Id.).

Plaintiff's attorney examined Ms. Lumpey, who testified that a limitation of being precluded from maintaining regular attendance and being punctual fifteen percent of the time would preclude work.  (Tr. 65).

Ms. Lumpey testified that an individual who required more than the customary number of breaks lasting fifteen minutes or more would be terminated.  (Id.).

## B.   **Relevant Medical Records**

Plaintiff was admitted at Hannibal Regional Hospital from July 7, 2005, through July 15, 2005, with a chief complaint of anxiety.  (Tr. 268).  Plaintiff reported that she had been depressed all her life, and that she had been sexually abused by her father from the age of nine to seventeen.

(Id.).  Plaintiff also reported episodes of hypomania and flight of ideas.  (Id.).  Plaintiff's discharge diagnoses were bipolar disorder type II,[9] panic disorder,[10] alcohol abuse, post-traumatic stress disorder ("PTSD"), and a GAF score of 65.[11]  (Tr. 269).  Plaintiff was prescribed Lexapro[12] and Klonopin,[13] and was instructed to follow-up with Dr. Harding.  (Tr. 270).

Plaintiff presented to Jeffrey Harden, D.O. on July 18, 2005, with complaints of panic attacks since February of 2005.  (Tr. 277).  Plaintiff reported that an elderly man at her workplace had died, and she had become increasingly withdrawn.  (Id.).  Dr. Harden diagnosed plaintiff with panic disorder, PTSD, and alcohol abuse in partial remission.  (Id.).  Dr. Harden continued plaintiff's Klonopin and Lexapro.  (Id.).  On August 10, 2005, plaintiff reported that she has expressed her anger with her husband more, and that her panic attacks had returned.  (Tr. 279).

Plaintiff presented to the emergency room at Pershing Health System on August 25, 2006, with complaints of panic disorder and anxiety.  (Tr. 361).

Plaintiff was admitted at Pershing Memorial Hospital from March 26, 2009, through March 29, 2009, with acute respiratory distress.  (Tr. 298).  Plaintiff's discharge diagnoses were

_____

[9]An affective disorder characterized by the occurrence of alternating hypomanic and major depressive episodes.  Stedman's at 568.

[10]Recurrent panic attacks that occur unpredictably.  Stedman's at 570.

[11]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[12]Lexapro is an antidepressant drug indicated for the treatment of major depressive disorder and generalized anxiety disorder.  See PDR at 1174-75.

[13]Klonopin is indicated for the treatment of panic disorder.  See PDR at 2639.

acute respiratory distress, acute exacerbation of bronchial asthma, and dehydration.  (Id.).

Plaintiff was admitted at Northeast Regional Medical Center from May 20, 2009, through May 22, 2009, with diagnoses of severe persistent asthma with acute exacerbation, anxiety, type 2 diabetes mellitus,[14] hypertension, and seasonal allergies.  (Tr. 305).  It was noted that plaintiff had had asthma exacerbations over the past few months, and that this was at least her second or third exacerbation since spring.  (Id.).

Plaintiff saw Dr. Lary Ciesemier and Dr. Minerva Concepcion for treatment of her allergies and asthma, beginning in June 2009.  (Tr. 342, 540).  On August 26, 2009, plaintiff presented to Dr. Ciesemier with complaints of worsening asthma, with symptoms of waking up twice at night and being unable to breathe, coughing, wheezing, dyspnea, and chest tightness.  (Tr. 348).  Dr. Ciesemier prescribed allergy injections every four weeks.  (Tr. 349).

Plaintiff presented to the emergency room at Pershing Memorial Hospital on April 24, 2010, due to an asthma attack.  (Tr. 378).  Plaintiff was diagnosed with acute exacerbation of asthma.  (Tr. 379).

Plaintiff presented to the emergency room at Pershing Memorial Hospital on June 14, 2010, with complaints of dyspnea.  (Tr. 380).  Plaintiff was diagnosed with asthma.  (Tr. 381).

Plaintiff presented was admitted at Boone Hospital Center from June 15, 2010, through

---

[14]Diabetes mellitus is a chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced. It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, water and electrolyte loss, ketoacidosis, and coma.  Stedman's at 529.  Type II diabetes is characterized by high blood glucose levels caused by either a lack of insulin or the body's inability to use insulin efficiently; it develops most often in middle-aged and older adults. Id. at 530.

June 17, 2010, with status asthmaticus.[15]  (Tr. 384).  Plaintiff's examination revealed decreased breath sounds and intense rales throughout her entire chest, which cleared over the  next several days.  (Id.).  It was noted that plaintiff cried throughout her entire discharge examination.  (Tr. 385).  Plaintiff was given Prozac and Ativan.  (Id.).  Plaintiff was not stable, but plaintiff's husband insisted on taking her home.  (Id.).  Upon discharge, plaintiff was diagnosed with status asthmaticus, improved; tobacco addition; and bipolar disease with current depression.  (Id.).  It was noted that plaintiff was taking some very expensive medications and that she found them too expensive and only took her medications intermittently.  (Tr. 386).

Plaintiff presented to Dr. Concepcion on September 29, 2010, with complaints of severe asthma.  (Tr. 542).

On October 28, 2010, plaintiff presented to Community Medical Associates with complaints of difficulty breathing, coughing, and sinus pain.  (Tr. 424).  Plaintiff underwent a chest x-ray, which revealed left upper lobe pneumonia; and findings suggesting chronic obstructive pulmonary disease ("COPD").  (Tr. 458).

Plaintiff presented to the emergency room at University of Missouri Hospital on January 3, 2011, after her husband reported she had been in bed for the past four days.  (Tr. 495).  Plaintiff was initially hostile, irritable, and uncooperative.  (Id.).  Plaintiff reported that she had been sleeping too much, was bipolar, and "it is time to go, it is time to leave this place."  (Id.).  Plaintiff indicated that she had been in bed because she did not want to deal with any of her family stress, and that she had been taking Ativan to keep her sedated.  (Tr. 496).  Plaintiff reported problems concentrating at work and at home for about two years, after she experienced a serious asthma

_____

[15]A condition of severe, prolonged asthma.  Stedman's at 1830.

attack.  (Id.).  Plaintiff reported periods during which she feels really happy and engages in risky

behavior including illegal things and excessive spending, followed by periods during which she is

sad.  (Id.).  Plaintiff stated that she wished her life would end, although she did not want to kill

herself.  (Id.).  Plaintiff reported using "almost every drug."  (Tr. 497).  Plaintiff indicated that she

uses cocaine or methamphetamine when she wants to get high, and she uses Ativan if she needs to

come down.  (Id.).  Plaintiff reported experiencing increased anxiety in the past two days, with

panic attacks.  (Id.).  Plaintiff also indicated that she hardly leaves her home between March and

October due to allergies and the fear of experiencing an asthma attack.  (Id.).  Plaintiff reported

that her father sexually abused her for several years beginning when she was nine, and was

currently in prison for life for molesting other young girls.  (Tr. 498).  Upon mental status

examination, plaintiff was not very well-kempt; was initially very irritable but became tearful and

more cooperative with the assessment; eye contact was poor; her mood was irritable and upset;

her affect was very tearful; she expressed a passive death wish; her insight was poor; and her

judgment was fair.  (Tr. 499).  Plaintiff was diagnosed with polysubstance abuse, rule out

dependence; prescription drug abuse; bipolar disorder NOS; rule out mood disorder secondary to

general medical condition; and a GAF score of 45.[16]  (Tr. 500).  It was advised that plaintiff be

admitted, based on her depressive symptoms and lack of self-care, but plaintiff's family declined.

(Id.).  It was recommended that plaintiff's husband secure and lock all guns and weapons.  (Id.).

Plaintiff was prescribed Prozac.  (Id.).

  Plaintiff returned to the emergency room at University Hospital on January 4, 2011,

---

[16]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in
social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at
32.

reporting that her depression was worse and requesting admission.  (Tr. 517).  Plaintiff's husband

reported that plaintiff was not eating or drinking and had stayed in bed since leaving the hospital

the previous day.  (Tr. 527).  He also indicated that plaintiff had an episode of slurred speech and

difficulty walking.  (Id.).  Plaintiff was admitted to the University of Missouri Psychiatric Center,

and was placed on suicide observation.  (Id.).  Plaintiff's husband reported that plaintiff

experienced super highs and lows, and tended to have more low moods with forgetfulness.  (Tr.

525).  Plaintiff's daughter reported that plaintiff had always suffered from depression, but her

symptoms increased one year prior after she received a letter form her father who was in prison

for sexually molesting plaintiff and other children.  (Id.).  Plaintiff was given multiple psychotropic

drugs during her hospitalization, and her mood and behavior gradually improved.  (Id.).  Plaintiff

was discharged on January 7, 2011, with diagnoses of bipolar affective disorder NOS;

polysubstance dependence; personality disorder NOS; GAF score of 40[17] on admission, and a

GAF score of 50 on discharge.  (Tr. 523).  She was prescribed Celexa[18] and Seroquel.  (Tr. 526).

It was recommended that plaintiff follow-up with the Still Specialty Clinic.  (Id.).

    Plaintiff saw Laura Still, LCSW, at Still Speciality Clinic on January 11, 2011.  (Tr. 538).

Plaintiff reported a history of sexual abuse by her alcoholic bipolar, schizophrenic father.  (Id.).

Plaintiff indicated that she had difficulty with focus due to anxiety and depression and did not

want to return to work.  (Id.).  On January 18, 2011, Ms. Still noted that plaintiff was trying to

---

[17]A GAF score of 31 to 40 denotes "[s]ome impairment in reality testing or
communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in
several areas, such as work or school, family relations, judgment, thinking, or mood (e.g.,
depressed man avoids friends, neglects family, and is unable to work...)."  DSM-IV at 32.

[18]Celexa is an antidepressant drug indicated for the treatment of depression.  See PDR at
1161.

accept her bipolar diagnosis and what it means for her future. (Tr. 537). Ms. Still recommended that plaintiff look for a bipolar support group. (Id.).

Plaintiff presented to the emergency room at Pershing Memorial Hospital on May 20, 2011, due to an asthma attack. (Tr. 547). It was noted that plaintiff had audible wheezing, was unable to finish a sentence, and was gasping for air. (Id.). Plaintiff was diagnosed with acute asthma exacerbation, acute dyspnea, and anxiety. (Tr. 551).

Plaintiff underwent scheduled injections at Pershing Memorial Hospital on May 21, 2011, and May 22, 2011. (Tr. 573-74). On May 22, 2011, plaintiff reported that she was not getting much better. (Tr. 573).

Plaintiff underwent chest x-rays on June 2, 2011, which revealed findings suggesting COPD. (Tr. 572).

Plaintiff presented to Dr. Lawrence Lampton on June 6, 2011, for treatment of "out of control asthma." (Tr. 584). Dr. Lampton diagnosed plaintiff with chronic sinusitis, allergic rhinitis, asthma, and COPD. (Id.).

Plaintiff saw Brooke J.D. Preylo, Psy.D., clinical psychologist, for a psychological consultative evaluation on July 8, 2011. (Tr. 605-10). Plaintiff reported bipolar disorder, which began interfering with her ability to work six years prior, although it became even more problematic in the last two years. (Tr. 605). Plaintiff indicated that she began receiving mental health treatment in 1987, at which time her primary care doctor prescribed Prozac. (Id.). Plaintiff reported that she had received outpatient psychiatric treatment in the past but stated: "it was always somebody who wanted to talk about my childhood and if you want me to be suicidal that's the way to do it." (Id.). Plaintiff reported that she found someone who did not force her to talk

- 14 -

about her childhood, but she was unable to afford the $35.00 co-pay. (Id.). Plaintiff was taking Prozac and Seroquel at the time of her examination. (Tr. 606). Plaintiff reported manic phases, during which she started projects but could not follow through with them, could not "turn off" her brain, heard things that were not real, engaged in inappropriate behavior, talked too fast, felt "bulletproof," tried to appear normal at work, and spent excessive amounts of money on items she did not need. (Id.). Plaintiff indicated that she had been off illegal drugs for about six months, with the exception of "some" marijuana. (Tr. 607). Plaintiff reported that she had not consumed alcohol in one week, and that she drinks when her nerves bother her. (Id.). Upon mental status examination, plaintiff was cooperative; her mood was "down," and was appropriate to the areas of discussion; her affect was sad and she became tearful; her insight was limited; and her judgment was impaired. (Tr. 608). Dr. Preylo diagnosed plaintiff with bipolar disorder, severe with psychotic features, provisional; polysubstance dependence; alcohol abuse; and a GAF score of 50. (Tr. 609). Dr. Preylo expressed the opinion that plaintiff is able to understand and remember moderately complex instructions during a normal workday; can concentrate and persist on moderately complex tasks; demonstrates the capacity to interact in limited contact social situations involving the general public; demonstrates the capacity to interact in limited contact situations involving supervisors and co-workers; is able to adapt to a moderately demanding environment; and is not capable of managing funds independently. (Tr. 609). Dr. Preylo stated that plaintiff's diagnostic presentation is confounded by her substance use, and that it is "highly likely" that such use contributes considerably to her alleged symptoms and functional impairment. (Id.). Dr. Preylo stated that, for this reason, the diagnosis of bipolar I disorder is given provisionally with the caveat that accurate diagnosis will be difficult until she has experienced a

sustained period of time that she is substance free.  (Id.).

State agency psychologist Mark Altomari, Ph.D., completed a Psychiatric Review Technique on July 29, 2011, in which he expressed the opinion that plaintiff had a marked limitation in her ability to maintain social functioning; and moderate limitations in her activities of daily living, and ability to maintain concentration, persistence or pace.  (Tr. 626).  Dr. Altomari also completed a Mental Residual Functional Capacity Assessment, in which he found that plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. 615-16).  In his Functional Capacity Assessment, Dr. Altomari stated that plaintiff can understand, remember and carry out simple instructions; can generally relate appropriately to coworkers and supervisors in limited contact social situations; can be expected to perform best in a work setting where she can complete tasks relatively independently and where social interaction is not a primary job requirement; can make simple work related decisions; and her ability to adapt to routine changes in the workplace is intact for most situations.  (Tr. 617).

Plaintiff presented to Dr. Concepcion on November 18, 2011, with complaints of asthma and anxiety.  (Tr. 658).  It was noted that plaintiff had experienced an asthma attack requiring care on September 22, 2011.  (Id.).  On December 23, 2011, plaintiff was nervous and shaky, and panicked, and reported experiencing an asthma flare-up.  (Id.).

Plaintiff presented to Lilliana Garcia, M.D., at the Endocrinology IM Clinic, on January

13, 2012, for diabetes management upon the referral of her primary care provider due to low cortisol excretion.  (Tr. 652-55).  Plaintiff reported symptoms of tiredness, fatigue, and lightheadedness.  (Tr. 652).  Plaintiff had been receiving steroids for asthma exacerbation for many years.  (Id.).  Upon examination, plaintiff looked tired.  (Tr. 654).  Dr. Garcia stated that plaintiff's symptoms of chronic fatigue may be related to adrenal insufficiency developed by chronic exposure to steroids.  (Id.).  Dr. Garcia recommended additional testing.  (Id.).

On February 16, 2012, plaintiff reported an asthma flare-up.  (Tr. 659).  Dr. Concepcion told plaintiff to use her nebulizer four to five times a day instead of one to three times, because she had run out of her inhaler and her insurance company would not refill it due to overuse.  (Id.).

Plaintiff presented to Dr. Harden on March 23, 2012, for a psychiatric examination.  (Tr. 669-72).  Plaintiff reported experiencing auditory hallucinations and irrational thoughts that her husband is cheating on her.  (Tr. 669).  Plaintiff reported that she got in trouble with one of her previous employers because she was noted to be arguing with herself out loud with enough passion that at times she was yelling.  (Id.).  Plaintiff had seen Dr. Harden on four occasions in 2005.  (Id.).  Plaintiff reported that she was not capable of responsibly managing her own money, medications, healthcare, or hygiene.  (Id.).  Plaintiff indicated that her abilities to cook, clean, shop, and drive were markedly impaired by a lack of motivation, and that her shopping was additionally impaired by feelings of anxiousness and suspiciousness that people in the store are paying undue and critical attention to her.  (Id.).  Plaintiff reported using alcohol one to two times per month, and using marijuana irregularly and only after she runs out of her month's supply of Ativan.  (Id.).  Plaintiff was charged with misuse of funds of her last employer and these charges were still pending.  (Tr. 670).  Upon mental status examination, plaintiff appeared excessively

- 17 -

tired and assumed a recumbent position on the couch; her quantity of speech fluctuated, giving excessively prolonged and circumstantial answers to questions; her vocal tone was notably diminished; her thought processes were logical but she ruminantly spontaneously returned to themes of disappointment in her family currently and the trauma of her childhood sexual abuse; her affect was sad and her affect was tearful; she reported that the evaluation made her very anxious; she stated that she hates herself; she reported having post-traumatic nightmares most nights and reported post-traumatic flashback memories on a daily basis; she reported frequent anxiety and panic attacks; she reported compulsive behavior; she reported occasional suicidal ideation but denied suicidal intention; and her insight and judgment were appropriate.  (Tr. 670-71).  Dr. Harden diagnosed plaintiff with bipolar disorder type I,[19] most recent episode depressed; PTSD; alcohol abuse in remission; marijuana use; borderline personality traits; the highest GAF score in the past year of 50, and a current GAF score of 35.  (Tr. 671).  Dr. Harden stated that plaintiff presents as a woman with ongoing serious psychiatric disorders which are being inadequately treated.  (Id.).  Dr. Harden strongly recommended that plaintiff pursue further psychiatric treatment with a mental health professional.  (Tr. 671-72).

Dr. Harden completed a Mental Residual Functional Capacity Form, in which he expressed the opinion that plaintiff's mental condition precluded performance for fifteen percent of an eight-hour workday in the following areas: ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual and within customary tolerances; sustain an ordinary routine without special

---

[19]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes.  Stedman's at 568.

supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions form psychologically-based symptoms and without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 673-74).

Plaintiff saw Dr. Harden on May 29, 2012, at which time plaintiff complained of stress, fear, anger, and frustration.  (Tr. 680).  Dr. Harden increased plaintiff's Seroquel, and continued her Prozac and Ativan.  (Id.).  On June 13, 2012, Dr. Harden discussed adding Lithium[20] to treat plaintiff's bipolar mood swings.  (Tr. 682).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: chronic obstructive pulmonary disorder (COPD)/asthma, bipolar disorder, post traumatic stress disorder (PTSD), and a panic disorder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR

---

[20]Lithium is indicated for the treatment of bipolar disorder.  See WebMD, http://www.webmd.com/drugs (last visited August 28, 2013).

Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift 10 pounds occasionally and 20 pounds frequently.  She can stand/walk 6 of 8 hours and sit 6 of 8 hours.  She has an unlimited ability to push/pull.  She can only occasionally balance.  And as a result of a loss of concentration, persistence and pace due to her mental impairments, she is limited to simple, unskilled work of an SVP 2 or less.  Further, due to a panic disorder and agoraphobia she must have limited contact with the public.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on July 7, 1963 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2011, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-20).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on April 28, 2011, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

(Tr. 20).

- 20 -

## Discussion

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.      Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598,

601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of

- 22 -

whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.      Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in failing to find plaintiff's chronic fatigue to be a

severe impairment.  Plaintiff next argues that the ALJ's mental residual functional capacity

assessment is not supported by substantial medical evidence.  Plaintiff also contends that the ALJ

erred in assessing the credibility of plaintiff's subjective allegations.  Plaintiff finally argues that the

ALJ's RFC determination and hypothetical question posed to the vocational expert did not

precisely set forth plaintiff's credible limitations.  The undersigned will address plaintiff's claims in

turn.

**1.      Chronic Fatigue**

Plaintiff contends that the ALJ erred in failing to find her chronic fatigue to be a severe

impairment.

"An impairment is not severe if it amounts only to a slight abnormality that would not

significantly limit the claimant's physical or mental ability to do basic work activities."  Kirby v.

Astrue, 500 F.3d 705, 707 (8th Cir. 2007).  It is the claimant's burden to establish that an

impairment is severe.  Id.  "Severity is not an onerous requirement for the claimant to meet, but it

is also not a toothless standard . . . ."  Id. at 708.

The ALJ found that plaintiff has the following severe impairments: chronic obstructive

pulmonary disorder (COPD)/asthma, bipolar disorder, post traumatic stress disorder (PTSD), and

panic disorder.  (Tr. 13).  The ALJ acknowledged that plaintiff sought treatment for chronic

fatigue in January 2012, but found that this impairment has not met the duration requirements as

objective evidence has not revealed that it has lasted or is expected to last at least twelve months.

(Id.).

Plaintiff contends that the ALJ failed to "note the Plaintiff may have developed an adrenal

insufficiency secondary to chronic exposure to steroids." (Doc. No. 14, p. 25).  The record

reveals that plaintiff saw endocrinologist Dr. Garcia on January 13, 2012, with complaints of

tiredness, fatigue, and lightheadedness.  (Tr. 652).  Dr. Garcia noted that plaintiff looked tired.

(Tr. 654).  Dr. Garcia stated that plaintiff's symptoms of chronic fatigue "may be related to

adrenal insufficiency developed by chronic exposure to steroids."  (Id.).

Plaintiff has failed to establish that chronic fatigue resulting from adrenal insufficiency was

a severe impairment.  While plaintiff sought treatment for chronic fatigue in January of 2012 and

Dr. Garcia indicated that the fatigue may be related to adrenal insufficiency, Dr. Garcia did not

diagnose plaintiff with adrenal insufficiency and there is no record of any follow-up with Dr.

Garcia.  Thus, the ALJ did not err in failing to find plaintiff's chronic fatigue resulting from an

adrenal insufficiency as a severe impairment at step two of the sequential analysis.  The

undersigned, however, notes that plaintiff's fatigue was discussed by mental health providers and

was relevant with regard to plaintiff's mental RFC.

## 2.    Residual Functional Capacity

Plaintiff contends that the ALJ's mental RFC determination is not supported by substantial

evidence.  Plaintiff also argues that the ALJ failed to properly assess the credibility of plaintiff's

subjective allegations in determining her RFC.

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).  An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

The ALJ made the following determination with regard to plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift 10 pounds occasionally and 20 pounds frequently.  She can stand/walk 6 of 8 hours and sit 6 of 8 hours.  She has an unlimited ability to push/pull.  She can only occasionally balance.  And as a result   of a loss of concentration, persistence and pace due to her mental impairments, she is limited to simple, unskilled work of an SVP 2 or less.  Further, due to a panic disorder and agoraphobia she must have limited contact with the public.

(Tr. 15).

Plaintiff contends that the ALJ's RFC determination is inconsistent with the medical opinion evidence of record.  Specifically, plaintiff argues that Drs. Preylo, Harden, and Altomari all found that plaintiff had greater social limitations than those found by the ALJ.

- 26 -

Plaintiff saw Dr. Preylo for a psychological consultative evaluation on July 8, 2011.  (Tr. 605-10).  Plaintiff reported manic phases, during which she started projects but could not follow through with them, could not "turn off" her brain, heard things that were not real, engaged in inappropriate behavior, talked too fast, felt "bulletproof," tried to appear normal at work, and spent excessive amounts of money on items she did not need.  (Tr. 606).  Upon mental status examination, plaintiff was cooperative; her mood was "down," and was appropriate to the areas of discussion; her affect was sad and she became tearful; her insight was limited; and her judgment was impaired.  (Tr. 608).  Dr. Preylo diagnosed plaintiff with bipolar disorder, severe with psychotic features, provisional; polysubstance dependence; alcohol abuse; and a GAF score of 50.  (Tr. 609).  Dr. Preylo expressed the opinion that plaintiff is able to understand and remember moderately complex instructions during a normal workday; can concentrate and persist on moderately complex tasks; demonstrates the capacity to interact in limited contact social situations involving the general public; demonstrates the capacity to interact in limited contact situations involving supervisors and co-workers; is able to adapt to a moderately demanding environment; and is not capable of managing funds independently.  (Tr. 609).

Plaintiff saw Dr. Harden for a psychiatric examination on March 23, 2012.  (Tr. 669-72). Plaintiff had seen Dr. Harden for her mental impairments on four prior occasions in 2005.  (Tr. 669).  Plaintiff reported experiencing auditory hallucinations, and indicated that she got in trouble with one of her previous employers because she was noted to be arguing with herself out loud with enough passion that at times she was yelling.  (Id.).  Plaintiff reported that she was not capable of responsibly managing her own money, medications, healthcare, or hygiene.  (Id.). Upon mental status examination, plaintiff appeared excessively tired and assumed a recumbent

position on the couch; her quantity of speech fluctuated, giving excessively prolonged and circumstantial answers to questions; her vocal tone was notably diminished; her thought processes were logical but she ruminantly spontaneously returned to themes of disappointment in her family currently and the trauma of her childhood sexual abuse; her affect was sad and her affect was tearful; she reported that the evaluation made her very anxious; she stated that she hates herself; she reported having post-traumatic nightmares most nights and reported post-traumatic flashback memories on a daily basis; she reported frequent anxiety and panic attacks; she reported compulsive behavior; she reported occasional suicidal ideation but denied suicidal intention; and her insight and judgment were appropriate. (Tr. 670-71). Dr. Harden diagnosed plaintiff with bipolar disorder type I, most recent episode depressed; PTSD; alcohol abuse in remission; marijuana use; borderline personality traits; the highest GAF score in the past year of 50, and a current GAF score of 35. (Tr. 671). Dr. Harden stated that plaintiff presents as a woman with ongoing serious psychiatric disorders which are being inadequately treated. (Id.). Dr. Harden saw plaintiff in May 2012 and June 2012 for treatment of her mental impairments. (Tr. 680-82).

Dr. Harden completed a Mental Residual Functional Capacity Form on March 23, 2012, in which he expressed the opinion that plaintiff's mental condition precluded performance for fifteen percent of an eight-hour workday in the following areas: ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual and within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions form psychologically-based symptoms and without an unreasonable number and length of rest periods;

- 28 -

interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 673-74).

Finally, Dr. Altomari, a state agency psychologist, completed a Psychiatric Review Technique on July 29, 2011, in which he expressed the opinion that plaintiff possessed a marked limitation in her ability to maintain social functioning; and moderate limitations in her activities of daily living, and ability to maintain concentration, persistence or pace.  (Tr. 626).  Dr. Altomari also completed a Mental Residual Functional Capacity Assessment, in which he found that plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. 615-16).  In his Functional Capacity Assessment, Dr. Altomari stated that plaintiff can understand, remember and carry out simple instructions; can generally relate appropriately to coworkers and supervisors in limited contact social situations; can be expected to perform best in a work setting where she can complete tasks relatively independently and where social interaction is not a primary job requirement; can make simple work related decisions; and her ability to adapt to routine changes in the workplace is intact for most situations.  (Tr. 617).

The undersigned finds that the ALJ erred in determining plaintiff's mental RFC.  Every mental health professional who expressed an opinion regarding plaintiff's limitations found greater

social limitations than those found by the ALJ.  Dr. Preylo found that plaintiff had the capacity to interact in only limited contact situations involving supervisors and co-workers.  (Tr. 609).  Dr. Harden found that plaintiff's mental impairments precluded performance for fifteen percent of an eight-hour workday in the areas of working in coordination with or proximity to others without being distracted by them; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr.  673-74).  Dr. Altomari expressed the opinion that plaintiff had a marked limitation in her ability to maintain social functioning; and moderate limitations in her ability to work in coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 615-16).  In his Functional Capacity Assessment, Dr. Altomari stated that plaintiff can generally relate appropriately to coworkers and supervisors in limited contact social situations; and can be expected to perform best in a work setting where she can complete tasks relatively independently and where social interaction is not a primary job requirement.  (Tr. 617).

The ALJ provided no explanation for his failure to include limitations in plaintiff's ability to interact with supervisors or co-workers.  The ALJ found that Dr. Altomari's opinion was consistent with the record as a whole and was given substantial weight.  The ALJ's RFC assessment, however, did not include all of the social functioning limitations found by Dr. Altomari.  The objective medical evidence reveals that plaintiff experienced significant psychiatric symptomatology, including auditory hallucinations and suicidal thoughts, and was taking multiple psychotropic drugs.  Plaintiff testified that she stays in bed all day because she does not want to be

around people. (Tr. 58). The ALJ cited no medical evidence in support of his findings regarding plaintiff's social limitations. Thus, the ALJ's mental RFC determination is not supported by the evidence of record.

Plaintiff also contends that the ALJ erred in failing to include any limitations from plaintiff's COPD or asthma. Plaintiff argues that the ALJ should have limited plaintiff's exposure to pulmonary irritants, such as excessive dust or fumes.

The ALJ found that plaintiff's COPD/asthma were severe impairments. (Tr. 13). The ALJ subsequently stated that the record reveals that plaintiff's asthma was "relatively controlled." (Tr. 16).

The record does not support the ALJ's finding that plaintiff's asthma was well-controlled. Rather, the record reveals that plaintiff sought emergency room treatment on multiple occasions for respiratory distress. In May 2011, plaintiff presented to the emergency room due to an asthma attack. (Tr. 547). Plaintiff had audible wheezing, was unable to finish a sentence, and was gasping for air. (Id.). Plaintiff was diagnosed with acute asthma exacerbation, acute dyspnea, and anxiety. (Tr. 551). Plaintiff subsequently underwent scheduled injections. (Tr. 573-74). Plaintiff underwent chest x-rays on June 2, 2011, which revealed findings suggesting COPD. (Tr. 572). Plaintiff sought treatment from Dr. Lampton on June 6, 2011, for "out of control asthma." (Tr. 584). Plaintiff complained of asthma attacks to Dr. Concepcion in November 2011, December 2011, and February 2012. (Tr. 658). In February 2012, Dr. Concepcion advised plaintiff to use her nebulizer four to five times a day due to asthma flare-ups. (Tr. 659). Plaintiff testified at the hearing that she stays inside most of the time because she is allergic to everything outside and she is sensitive to temperature extremes. (Tr. 52). The evidence of record reveals that plaintiff's

- 31 -

asthma was not well-controlled, and would result in some functional limitations.

Plaintiff also contends that the ALJ erred in assessing the credibility of plaintiff's subjective allegations when determining plaintiff's RFC.  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the <u>Polaski</u> factors."  <u>Kelley</u>, 133 F.3d at 588.  <u>Polaski</u> requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).  <u>See</u> <u>also</u> <u>Burress</u>, 141 F.3d at 880; 20 C.F.R. § 416.929.

The ALJ first noted that plaintiff has not sought regular treatment for her mental impairments.  (Tr. 17).  The ALJ discredited plaintiff's allegations of inability to afford treatment, noting that plaintiff had insurance through her husband's employment.  (Tr. 17).        The fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability.  <u>See</u> <u>Gwathney v. Chater</u>, 104 F.3d 1043, 1045 (8th Cir. 1997).  Plaintiff, however, testified that she has not seen a psychiatrist or other mental health professional regularly because she cannot afford the co-pays for treatment or medications.  (Tr. 56).  Plaintiff testified that she had to file for bankruptcy after her last manic episode because she incurred $42,000.00 in credit card debt.  (<u>Id.</u>).  Plaintiff's testimony is consistent with her statement to Dr. Preylo that she was unable to afford the $35.00 co-pay to see a psychiatrist.  (Tr. 605).  The ALJ did not address plaintiff's testimony regarding an inability to afford treatment despite having insurance.

The ALJ next noted that no physician or psychiatrist has expressed the opinion that

plaintiff is unable to work.  (Tr. 18).  None of plaintiff's treating physicians, however, provided an

opinion regarding plaintiff's limitations.  "A treating doctor's silence on the claimant's work

capacity does not constitute substantial evidence supporting [an] ALJ's functional capacity

determination when the doctor was not asked to express an opinion on the matter and did not do

so, particularly when that doctor did not discharge the claimant from treatment."  Pate-Fires v.

Astrue, 564 F.3d 935, 943 (8th Cir. 2009).  In addition, as previously discussed, plaintiff's

psychiatrist, Dr. Harden, provided a mental residual functional capacity assessment that was much

more restrictive than that of the ALJ.  Thus, the undersigned find that the ALJ erred in assessing

the credibility of plaintiff's subjective allegations.

Plaintiff also argues that the hypothetical question posed to the vocational expert was

erroneous.  The hypothetical question posed to the vocational expert was based on the ALJ's

RFC determination, which the undersigned has found is not supported by substantial evidence.

Consequently, the vocational expert's response was not based on substantial evidence.

**Conclusion**

In sum, the ALJ's RFC determination was not based on substantial evidence.  The ALJ

performed a faulty credibility analysis, and assessed an RFC that was inconsistent with the

objective medical evidence.  Every mental health provider who expressed an opinion regarding

plaintiff's functional capacity found greater social limitations than those found by the ALJ.  In

addition, the ALJ erred in failing to incorporate limitations resulting from plaintiff's asthma or

COPD.  For these reasons, this cause will be reversed and remanded to the ALJ in order for the

ALJ to properly assess plaintiff's credibility; and formulate a new residual functional capacity for

plaintiff based on the medical evidence in the record.  Accordingly, a Judgment of Reversal and

Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  23rd  day of September, 2013.


                                        _Lewis M. Blanton_____
                                        LEWIS M. BLANTON
                                        UNITED STATES MAGISTRATE JUDGE